563 A.2d 1201

**Rosella GRAY**

v.

**H.C. DUKE & SONS, INC., International Dairy Queen, Inc., Dairy Queen, Inc., and American Dairy Queen, Inc. and Mast Development Company**

**Appeal of H.C. DUKE & SONS, INC.**

Superior Court of Pennsylvania.

Argued April 11, 1989.

Filed Aug. 17, 1989.

96

98

Byron L. Milner, Philadelphia, for Duke & Sons, appellant (at 2945) and appellee (at 2946).

John F. Dougherty, Jr., Philadelphia, for Dairy Queen, appellant (at 2946) and appellee (at 2945).

Philip A. Ryan, Philadelphia, for Mast Development, appellee.

Before CAVANAUGH, OLSZEWSKI and HOFFMAN, JJ.

HOFFMAN, Judge:

These consolidated appeals are from the judgment entered below in an action for contribution. At appeal No. 2945 Phl 88, H.C. Duke & Sons, Inc. (Duke) contends that the trial court erred in denying its motion for judgment n.o.v. and a new trial on the grounds that the court (1) incorrectly submitted to the jury the question of apportionment of compensatory and punitive damages; (2) allowed a defendant's expert to testify as to the cause of the accident; and (3) refused to give a binding instruction that defendant Mast Development Company was negligent. At appeal No. 2946 Phl 88, Dairy Queen, Inc., International Dairy Queen, Inc., and American Dairy Queen, Inc., (collectively referred to herein as "Dairy Queen") also challenge the court's denial of their motion for judgment n.o.v. and a new trial on the issue of liability. For the reasons set forth below, we affirm.

The instant appeals arise from a contribution action that was instituted following the settlement of an underlying tort action filed by Rosella Gray. Rosella Gray was employed by a Dairy Queen franchise store located in King of Prussia. On October 8, 1981, Rosella Gray was operating a twin freezer ice cream machine, model number DR424 (DR424), when her right arm became entangled in the rotating auger shaft. As a result of the accident, Rosella Gray suffered severe and grave injuries requiring numer-

ous extensive operations and continuous treatment to minimize her physical and psychological pain. Rosella Gray commenced an action against Duke, the manufacturer of the DR424, and Dairy Queen, the supplier. In the complaint, Rosella Gray asserted claims for negligence, products liability, and punitive damages against Duke but filed only a claim for negligence against Dairy Queen. Thereafter, Duke and Dairy Queen joined Mast Development Company (Mast), the original designer of the DR424, as an additional defendant.[1]

■ Before the case proceeded to trial, Duke alone offered to settle with Rosella Gray for the sum of two million seven-hundred fifty thousand dollars ($2,750,000.00). The settlement offer was accepted and Rosella Gray signed a general release extinguishing her claims against all defendants. Duke subsequently commenced the instant action for contribution against Dairy Queen and Mast. At the conclusion of the trial, the jury returned a verdict finding in favor of Duke to the extent that Duke and Dairy Queen each were fifty percent (50%) negligent for the cause of Rosella Gray's injuries. In apportioning the settlement, the jury determined that six-hundred-eighty five thousand dollars ($685,000.00) represented compensatory damages and that the remainder of the settlement was attributable to punitive damages which could only be assessed against Duke. Additionally, the jury found in favor of Mast and against Duke on the ground that it was not causally liable for the injuries sustained by Rosella Gray. The court then molded the verdict to reflect the apportioning of liability and awarded Duke the sum of three-hundred-forty-two thousand five-hundred dollars ($342,500.00). Timely post-trial motions seeking judgment n.o.v. and a new trial were

1. Duke and Dairy Queen also joined the Angelica Uniform Group as an additional defendant. *See* Record at Part I Exhibit C, Stipulation, and Entry of Appearance of Additional Defendant. Angelica Uniform Group, however, was later dismissed from the suit by agreement of the parties.

filed by Duke and Dairy Queen and later denied by the court.[2] Following the entry of judgment, these appeals ensued.

2. We note that, in *DeFazio v. Labe*, 518 Pa. 390, 543 A.2d 540 (1988), our Supreme Court recently considered whether a verdict winner has standing to request a judgment n.o.v. In *DeFazio*, this Court had ruled that by its nature a judgment n.o.v. is a request upon the court to direct the verdict in favor of the *losing party* and thus is unavailable to the verdict winner. *See* 352 Pa.Super. 120, 126–27, 507 A.2d 410, 414 (1986). Our Supreme Court, however, was equally divided on the question. Chief Justice Nix, writing in support of affirmance of this Court's decision, reasoned that plaintiffs, as the prevailing party, should not be allowed to utilize a judgment n.o.v. to reapportion the liability assessed against the joint tortfeasors for the purpose of having the entire verdict satisfied by the non-settling tortfeasor. *See DeFazio*, 518 Pa. at 392–94, 543 A.2d at 541–42. In his opinion in support of reversal, however, Justice Papadakos stated:

> [c]learly, there will be few cases in which a verdict winner complains that his victory was erroneous as a matter of law. However, sometimes, as in the instant case, his legal position may be protected by just such a claim. It is imperative that some procedure exist so that such claims may be heard. Pa.R.C.P. 227.1 recognizes that need by authorizing 'any party' to file Motions for Post–Trial Relief.

*Id.*, 518 Pa. at 403, 543 A.2d at 547. Because the court was equally divided on this issue, the decision of the *Superior Court* was affirmed. *See id.*, 518 Pa. at 392, 543 A.2d at 541.

The instant case is distinguishable from *DeFazio*. In *DeFazio*, the plaintiffs, verdict winners in a negligence action, attempted to reduce the liability the jury had attributed to the settling tortfeasor in an effort to make the non-settling defendant responsible for the largest segment of the damage award. *See id.*, 518 Pa. at 395, 543 A.2d at 543 (OPINION IN SUPPORT OF REVERSAL BY PAPADAKOS, J.). As Chief Justice Nix noted, the plaintiffs wanted the greater proportion of liability assessed against the non-settling defendant solely because the settling defendant had insufficient funds to satisfy the verdict. *See id.*, 518 Pa. at 393–94, 543 A.2d at 542 (OPINION IN SUPPORT OF AFFIRMANCE BY NIX, C.J.). Thus, in effect, the plaintiffs were attempting to raise a claim that was more logically the subject of dispute between the *defendants*.

In the case at bar, Duke is not the plaintiff in the underlying action but instead is the plaintiff in the subsequent *contribution* action. The sole issue in the contribution action was whether, and to what extent, Dairy Queen and Mast were liable to Duke for contribution. In addition, because the jury found that Duke and Dairy Queen were *equally* liable, it is unclear whether Duke can be considered to have *prevailed* against Dairy Queen. Moreover, with respect to its claim against Mast, Duke clearly was the verdict *loser*, and thus it properly sought to have the verdict directed in its favor as to Mast. Because Duke does not qualify as a true verdict winner, we conclude that the

## DUKE'S APPEAL: DOCKET NO. 2945 PHL 88

### A.

Appellant Duke contends that the trial court erred in denying its motion for a new trial on the ground that the apportionment of punitive damages was excessive and unfounded. Duke first argues that there was insufficient evidence relating to the issue of apportionment at trial to submit the question to the jury. According to Duke, the only evidence offered during trial relating to the distribution of compensatory and punitive damages was the uncontradicted testimony of its expert witness, the Honorable Paul J. Cody. Secondly, Duke argues that the court erred in submitting to the jury the responsibility of apportioning the settlement into compensatory and punitive damages between the joint tortfeasors without first providing the jury with specific guidelines to be followed in apportioning the damages. Without specific instructions, Duke claims that the only proper question for the jury was whether the settlement was reasonable. We disagree with these contentions.

■ Initially, we note that in reviewing an order denying a motion for a new trial, our court assesses "whether the trial court clearly and palpably abused its discretion or committed an error of law which controlled the outcome of the case." *Sweitzer v. Dempster Systems*, 372 Pa.Super. 449, 453, 539 A.2d 880, 881 (1988).

■ Duke's first argument is that there was insufficient evidence introduced at trial to merit submitting the issue of punitive damages to the jury. Pennsylvania has adopted Section 908 of the Restatement (Second) of Torts and its provisions governing punitive damages. *Hoffman v. Memorial Osteopathic Hosp.*, 342 Pa.Super. 375, 383, 492 A.2d 1382, 1386–87 (1985) (citing *Chambers v. Montgomery*, 411 Pa. 339, 344, 192 A.2d 355, 358, 358 (1963); *Medvecz v. Choi*, 569 F.2d 1221 (3rd. Cir.1977)). Section 908 provides:

trial court did not err in entertaining Duke's motion for judgment n.o.v.

(1) Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future. (2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages the trier of fact can properly consider the character of the defendant's act, the nature and the extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

Restatement (Second) of Torts § 908. *See also DiSalle v. P.G. Pub. Co.*, 375 Pa.Super. 510, 544 A.2d 1345 (1988). It is within the province of the jury, as factfinder, to determine whether punitive damages should be awarded, and if so, the amount that should be awarded. *See id.*, 375 Pa.Superior Ct. at 567, 544 A.2d at 1373. An award of punitive damages will be reduced on appeal only if we determine that the award is excessive under the facts of the individual case. *Id.*

■ At the trial, Duke called the Honorable Paul J. Cody as an expert witness.[3] The purpose of Judge Cody's testimony was to explain to the jury the mechanics of assessing an award of damages in negligence and product liability actions. During direct examination, Judge Cody testified that after reviewing the doctors' reports and medical expenses, he estimated that had Rosella Gray's case been tried before a jury, the compensatory damage value would total approximately two million five hundred thousand dollars ($2,500,000.00). *See* N.T. Vol. III March 16, 1988 at

3. The record discloses the following information relating to Judge Cody's qualifications as an expert witness. Judge Paul J. Cody was a judge of the Court of Common Pleas in Philadelphia from 1971 to 1975 and was exclusively assigned to civil matters. *See* N.T. Vol. III March 16, 1988 at 27–31. For ten years immediately following his tenure on the bench, Judge Cody held the position of Civil Actions Commissioner, where his principal duty was to dispose of civil cases through settlement. *See id.* At the time of trial, Judge Cody was an independent contractor for the Judicate, a national private court system. *See id.*

52–54. On the issue of punitive damages, Judge Cody testified on cross-examination as follows:

Q [Mr. Ryan, Counsel for Mast]: Just a few follow-up questions. From your review of Mr. Bernstein's Pretrial Memorandum, did you feel that there is more than adequate evidence to submit the plaintiff's claim for punitive damages to a jury in this case?

A: Yes, I did.

Q: And that the punitive damage element or the claim for punitive damages was only going to be asserted against H.C. Duke & Sons; isn't that correct?

A: That is correct.

Q: And can you tell me what basis was for the punitive damage claim?

A: Yes. I forgot whether the fellow, the chief engineer at Duke—

Q: Raymond Damm?

A: That's right. That was his name. And he had recommended—he, in effect, told [Duke] in ordinary words, look, this is a dangerous product and we ought to put a guard on it. And [Duke was] phasing this machine out at the time and coming in with a new machine, and [Duke] decided they just wouldn't do it. [Duke] didn't abide by his—whatever you wanted to call, his recommendation.

*See id.* at 99–101. Judge Cody then testified that according to the evidence he reviewed, it was clear that Duke's chief engineer warned the company that the DR424 was unsafe two years in advance of Rosella Gray's accident. *See id.* Defense counsel continued to pursue this line of questioning by asking Judge Cody:

Q: And was it your conclusion that this evidence would inflame or enrage a jury in Philadelphia that there had been reckless disregard for the safety of individuals on the part of H.C. Duke?

*See id.* at 101. Before Judge Cody could respond, Duke's Counsel objected on the basis that it had already been established that the evidence merited submission of the punitive damage issue to the jury. *See id.* The court

overruled counsel's objection and Judge Cody proceeded to his conclusion that based on the the chief engineer's deposition stating that Duke was warned about the hazardous condition of the DR424 and refused to take precautionary measures, a jury was more than likely to award punitive damages. *See id.* at 101.

Furthermore, later in the proceedings, Mast's counsel read into evidence the deposition of Mr. Raymond Damm, chief engineer for Duke. *See id.* Vol. V, March 18, 1988 at 5–47. In his deposition, Mr. Damm admitted that in 1979, he considered placing a safety guard around the auger but that management declined to incorporate that safety measure into the construction of the DR424 or notify their customers as to the perceived dangers. *See id.* at 37–40. In light of the testimony of Judge Cody and the admission of Duke's chief engineer, we conclude that there was ample evidence to support an award of punitive damages against Duke. Accordingly, we find no error on the part of the trial court in submitting this issue to the jury. *DiSalle v. P.G. Pub. Co.,* 375 Pa.Super. 510, 567, 544 A.2d 1345, 1373 (1988).

 Duke also claims that the court erred in its instruction to the jury on the issue of apportionment of compensatory and punitive damages. Duke contends that the court should have given more specific guidelines that would have provided the jury with a set method for awarding punitive damages and that this error warrants a new trial. We disagree. In reviewing a claim premised on an erroneous jury instruction, we must look to the entire charge in light of the evidence presented. *Sweitzer v. Dempster Systems,* 372 Pa.Super. at 453, 539 A.2d at 881. A new trial will be granted only where we conclude that the jury instruction was erroneous and might have prejudiced the appellant's case. *Id.*

 Here, our review of the record reveals that during the trial, the court repeatedly cautioned the jury that if it was found that part of the settlement represented punitive damages, only Duke could be found liable on that charge

because such a claim was raised only against Duke in the underlying action. *See* N.T. Vol. III, March 16, 1988 at 100, 102–103; *id.* Vol. VI, March 21, 1988 at 27–29. In its charge, the court carefully articulated the legal principles involved in assessing punitive damages and stressed that, "[p]unitive damages must be based on conduct which is malicious, wanton, reckless, willful or oppressive." *See id.* Vol. VI, March 21, 1988 at 28–29. The court also informed the jury that the determination of the distribution of liability must be in proportion to the comparative faults of the parties.[4] *See id.* In addition, with regard to Duke's claim that the court failed to provide the jury with specific guidelines on setting punitive damages, we find that the court adequately set forth the then prevailing standard when it stated, *"[i]t is clear that punitive damages is [sic] supposed to bear a reasonable relationship as to compensatory damages.* That's the standard, albeit vague, that juries must apply when they are considering whether to charge someone with punitive damages...." *See id.* at 29 (emphasis added). *See also DiSalle v. P.G. Pub. Co.*, 375 Pa.Super. at 565, 544 A.2d at 1373–74 (rule that punitive damages must bear reasonable relationship to compensatory damage award acts as restriction on imposition of punitive damages).[5] In summary, after evaluating the jury instruction in its entirety, we are satisfied that the court charged the jury in a clear and impartial manner that sufficiently de-

4. This portion of the instruction is relevant because the jury was bound to assess the damages at no less and no more than the $2,750,000.00 settlement given to Rosella Gray.

5. We are aware that our Supreme Court has recently abolished the requirement that punitive damages must bear a reasonable relationship to compensatory damages. *See Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 103, 555 A.2d 800, 803 (1989). It is clear, however, that the *Kirkbride* decision does not render the court's jury instruction erroneous.

*Kirkbride* was decided almost one year after the jury trial in the instant case. Thus, the trial court's instruction that punitive damages must be reasonably related to compensatory damages was correct under the law at that time. *See DiSalle v. P.G. Pub. Co.*, 375 Pa.Super. at 565, 544 A.2d at 1373–74. Moreover, we note that a charge requiring a reasonable relationship between compensatory damages and punitive damages was more *beneficial* to Duke than a charge consistent with *Kirkbride.*

tailed the elements of compensatory and punitive damages and their relationship to each other. *See Sweitzer v. Dempster Systems,* 372 Pa.Super. at 453, 539 A.2d at 881. Accordingly, because we perceive no error in the court's instruction, we find this claim to be baseless. *See id.*

## B.

Duke next contends that the court erred in allowing Dr. Burton Paul to testify about the cause of Rosella Gray's accident when Mast's counsel did not first qualify him as an expert able "to testify as an accident reconstruction witness". *See* Brief for Appellant Duke at 14. The gravamen of Duke's argument is that Dr. Paul should not have been allowed to express his view that absent Duke's subsequent modification of Mast's original design of the DR424, Rosella Gray's accident would not have occurred. Specifically, Duke protests Dr. Paul's reference to a protruding screw that he said caused Rosella Gray's arm to become entangled in the machine.

▆▆▆▆ Generally, the decision to admit or exclude evidence is within the exclusive province of the trial court and, absent an abuse of discretion, will not be disturbed on appeal. *Egelkamp v. Egelkamp,* 362 Pa.Super. 269, 275, 524 A.2d 501, 504 (1987). In determining whether a witness qualifies as an expert, we must examine whether:

[the] witness has any reasonable pretension to specialized knowledge on the subject under investigation.... Such a person need not possess all the knowledge in his [or her] special field of activity in order to qualify.

The question of qualification of an expert witness is one for the discretion of the trial court.... A trial court will be reversed only for a clear case of error.

*Tyus v. Resta,* 328 Pa.Super. 11, 26, 476 A.2d 427, 435 (1984).

▆▆▆ Here, the record reveals that Dr. Paul was a professor of mechanical engineering at the University of Pennsylvania. *See* N.T. Vol. IV, March 17, 1988 at 146. Dr.

Paul graduated from Princeton University with a Bachelor of Science degree and received a Master of Science in engineering mechanics from Stanford. *See id.* at 147. While working for a research and development company, he earned his PhD degree in applied mechanics from the Poly-technic Institute of New York. *See id.* at 149. Over the course of his career he was associated with Bell Laboratories and Ingersoll–Rand and had worked on the mechanics and design of an extensive variety of equipment ranging from compressors to plastic producing machinery. *See id.* at 150–52. Dr. Paul published a book and over seventy articles concerning the dynamics of machinery. *See id.* at 154. Based on his extensive background and involvement with machinery, the trial court allowed Dr. Paul to be qualified as an expert witness in the areas of mechanical engineering and machine and design safety. *See id.* at 156–57.

During direct examination, Dr. Paul stated that he had reviewed the designs of the DR424 in its original form and the subsequent modifications performed by Duke. *See id.* at 159. Dr. Paul also visited the accident site and inspected the DR424 responsible for the accident. *See id.* His conclusion was that the DR424 produced by Duke was less safe than the prototype designed by Mast. *See id.* at 181–82. At one point in the proceedings, Mast's counsel inquired whether Dr. Paul had an opinion as to what modification implemented by Duke caused Rosella Gray's arm to become entangled in the DR424. Dr. Paul responded that a projecting screw had been added to the shaft. *See id.* at 182. Duke's counsel objected to the mention of the screw on the ground that no foundation had been laid to establish that such a modification existed. *See id.* Although Mast's counsel argued that this information was consistent with previously introduced evidence, the court sustained the objection. *See id.* at 183.

In light of our scope of review, we are satisfied that the lower court did not abuse its discretion in finding that Dr. Paul's expertise enabled him to review the innerworkings of

machinery and determine what could contribute to a machine's malfunctioning. Dr. Paul was well qualified to testify about the mechanics and safety of the DR424 and its relationship to Rosella Gray's accident. *See Tyus v. Resta,* 328 Pa.Super. 11, 26, 476 A.2d 427, 435 (1984). Thus, Duke's claim that Dr. Paul was unqualified to testify as an accident reconstruction expert is unfounded. Furthermore, Duke's claim with regard to Dr. Paul's specific reference to a screw on the shaft of the DR424 being instrumental in causing the accident is unsupported by the record. The court sustained Duke's objection to this testimony. Thus, this part of Duke's argument also must fail. Accordingly, we conclude that Duke's request for a new trial on this ground is without merit.

## C.

Duke's final contention is that the court erred in refusing to give a binding instruction directing the jury to return a verdict in favor of Duke on the issue of Mast's liability for negligence. Specifically, Duke submits that the testimony of Lewis Shuh, the original designer of the DR424 and an employee of Mast, required a finding of negligence on the part of Mast. This claim is waived. "[U]nless a specific exception has been taken to an alleged error in the trial court's instructions, the alleged error will be deemed waived and will not be considered by the reviewing court." *Wilkerson v. Allied Van Lines, Inc.,* 360 Pa.Super. 523, 537, 521 A.2d 25, 32 (1987), *appeal granted,* 517 Pa. 594, 535 A.2d 81 (1987), *appeal dismissed,* 518 Pa. 61, 540 A.2d 268 (1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 78, 102 L.Ed.2d 54 (1988). Here, although Duke submitted points for charge, it failed to take specific exception to the court's refusal to give a binding charge regarding Mast's negligence. *See* N.T. Vol. V, March 21, 1988 at 32. Accordingly, Duke has failed to preserve this claim for our review and its motion for judgment n.o.v. on this ground was properly denied by the court below. *See id.*

## DAIRY QUEEN'S APPEAL: DOCKET NO. 2946

Dairy Queen contends that the lower court erred in refusing to grant its motion for judgment n.o.v. or a new trial. As we have noted above, an order denying a motion for a new trial will be reversed only if we find that the trial court "clearly and palpably abused its discretion or committed an error of law which controlled the outcome of the case." *Sweitzer v. Dempster Systems*, 372 Pa.Super. at 453, 539 A.2d at 881. A judgment notwithstanding the verdict should be entered " 'only in a clear case, when the facts are such that no two reasonable persons could fail to agree that the verdict was improper; any doubts should be resolved in favor of the verdict winner.' " *Curran v. Philadelphia Newspapers, Inc.*, 376 Pa.Super. 508, 516, 546 A.2d 639, 643 (1988) (quoting *Geyer v. Steinbronn*, 351 Pa.Super. 536, 549, 506 A.2d 901, 908 (1986)). On appeal from the denial of a motion for judgment n.o.v., " 'the sole duty of the appellate court is to decide whether there was sufficient competent evidence to sustain the verdict, granting the verdict winner ... the benefit of every favorable inference reasonably to be drawn from the evidence.' " *Id.* We will not reverse the denial of a motion for judgment n.o.v. absent an abuse of discretion or an error of law which controlled the outcome of the case. *Berman v. Radnor Rolls, Inc.*, 374 Pa.Super. 118, 126, 542 A.2d 525, 529 (1988).

Dairy Queen contends that its motion should have been granted because there were no grounds upon which the jury could have found that it was liable for Rosella Gray's injuries. Specifically, Dairy Queen argues that the trial court erred in finding that there was "ample evidence upon which the jury could have found that [Dairy Queen] was a 'supplier' within the meaning of Restatement (Second) of Torts § 388." Trial Court Opinion at 9. We disagree. Section 388 provides in relevant part:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those

whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Id.* The Comment to § 388 of the Restatement then defines a "supplier" as follows:

*c. Persons included as "suppliers."* The rules stated in this Section and throughout this Topic apply to determine the liability of any person who for any purpose or in any manner gives possession of a chattel for another's use, or who permits another to use or occupy it while it is in his own possession or control, without disclosing his knowledge that the chattel is dangerous for the use for which it is supplied or for which it is permitted to be used. These rules, therefore, apply to sellers, lessors, donors, or lenders, irrespective of whether the chattel is made by them or by a third person.

*Id.*, Comment C. The trial court instructed the jury in accordance with § 388.

After carefully reviewing the record, we are satisfied that sufficient evidence was presented for the jury to find that Dairy Queen was a "supplier" pursuant to § 388. The trial evidence showed that Dairy Queen had significant ties with the design and manufacture of the DR424, and promoted its sale and distribution. The President of Duke testified that Dairy Queen contacted his company to commission the

manufacture of a twin freezer ice cream dispensing machine. *See* N.T. Vol. III, March 16, 1988 at 70–71. Duke in turn contacted Mast to design such a machine. *See id.* Mast then designed the DR424, and was paid directly by Dairy Queen for its work. *See id.* Duke manufactured the DR424s exclusively for Dairy Queen and sold them only to Dairy Queen and their licensees. *See id.* at 75, 94. Dairy Queen continued to have significant contacts with Duke while the DR424 was being manufactured, and periodically requested modifications in the design of the machine. *See id.* at 80–90. Moreover, we note that, in the Operating Agreement entered into by Dairy Queen and its licensees, it was stipulated that each franchise must purchase and utilize approved equipment. *See* N.T. Vol. III, March 16, 1988 at 15, 21, and Vol. IV, March 17, 1988 at 130–31. *See also* Exhibit D–9. The DR424 was an approved ice cream machine. We agree with the trial court that, based on this evidence,

> [i]t could reasonably have been inferred by the jury that [Dairy Queen] was merely supplying the DR424 through Duke. Thus, the conclusion that [Dairy Queen's] negligence was independent and not derivative was supported by the evidence.

> Although [the] modifications [requested by Dairy Queen] were not the legal cause of Rosella Gray's harm, they established that [Dairy Queen] was exercising control over Duke in the manufacture of the DR424.

Trial Court Opinion at 9. Because the record supports the trial court's determination that sufficient evidence was presented for the jury to find that Dairy Queen was liable as a "supplier" under § 388 of the Restatement, we conclude that the court did not err in denying Dairy Queen's motion for judgment n.o.v. or a new trial.

For the foregoing reasons, we affirm the judgment below.

Judgment affirmed.