574 A.2d 706

Pier CIPRIANI and Ann Cipriani, his wife, in their own right and as Parents and Natural Guardians of Michael Cipriani, David Cipriani and Tricia Cipriani, minors and Robert Liepholt and Susan Liepholt, his wife, in their own right and as Parents and Natural Guardians of Michael Liepholt, Melissa Liepholt and Jennifer Liepholt, minors and James J. Rowley and Gloria Rowley, his wife and John M. Atkins and Kathleen M. Atkins, his wife and George F. Hepp, Jr. and Marylynne Hepp, his wife and Pat G. Morales, Jr. and Divina Morales, his wife and George S. Hartman and Martha Hartman, his wife and Joseph P. Adams and Charlotte Adams, his wife and Richard Foley and Jayne Foley, his wife

v.

SUN PIPE LINE COMPANY and Tri–State Telecommunications, Inc. and Davis Enterprises, Inc.

v.

E.A. DESIGNS, LTD. and Pennsylvania One Call Systems, Inc. and Maple Shade Cable Company, Inc. and Newtown Township and Newtown Cablevision, Inc. and Jan Gouza and Pickering Corts & Summerson.

Appeal of SUN PIPE LINE COMPANY.

Superior Court of Pennsylvania.

Argued May 16, 1989.

Filed May 11, 1990.

472

474

Kenneth Scott and Bruce J. Chasan, Philadelphia, for Sun Pipe Line, appellant (at 2859) and appellee (at 3063).

Howard J. Creskoff, Philadelphia, for Cipriani, Liepholt, Rowley, Atkins, Hepp, Morales, Hartman, Adams and Foley, appellees (at 2859 and 3063).

William F. Schroeder, Newtown, for Pennsylvania One Call Systems, appellee (at 2859 and 3063).

Gary Gremminger, Philadelphia, for Gouza and Pickering Corts & Summerson, appellants (at 3063) and appellees (at 2859).

Before CIRILLO, President Judge, and ROWLEY and HESTER, JJ.

HESTER, Judge:

This is a consolidated appeal by Jan Gouza and his engineering firm, Pickering Corts and Summerson, Inc. (collectively "Gouza") and Sun Pipe Line Company ("Sun") from judgment entered following an order denying their motions for post-trial relief. We affirm.

This class action was instituted as a result of a construction accident which occurred on November 12, 1982, in Newtown Township, Bucks County. During excavation work being performed by a local cable company to install cable lines, 50,000 gallons of unleaded gasoline spilled into the environment when one of Sun's lines was ruptured. The line was located under a state road. Appellees, residents of a housing development adjacent to the site of the accident, instituted this action against Sun, Tri–State Telecommunications, Inc. ("Tri–State"), and Davis Enterprises ("Davis"). Subsequently, Gouza, E.A. Designs, Ltd. ("Designs"), and Pennsylvania One Call System, Inc. ("PA One–Call") were joined as defendants. Then, Sun's separate actions against the other defendants for its damages resulting from the accident were joined with this action.

During September and October, 1986, the issue of liability only [1] for the accident was tried before a jury. On October 20, 1986, the jury returned its verdict, apportioning liability as follows: 1) forty percent to Tri–State; 2) eighteen percent to Sun; 3) fifteen percent to Gouza; 4) fourteen percent to Designs; 5) thirteen percent to Davis; and 6) no liability on the part of PA One–Call. Gouza and Sun are the only defendants to file appeals from the verdict.

## Appeal of Gouza

The facts relevant to the issues raised in Gouza's appeal may be summarized as follows. Sun's pipeline, constructed in 1956, passes under Route 332 (Richboro Road) in Newtown Township near the Newtown Crossing housing development where appellees [2] reside. The pipeline crosses under Route 332 at the intersection of Mill Pond Road, a main access road to the development, and the pipeline remains underground along Route 332 for a distance of 2000 feet,

**1.** The trial court certified plaintiff-homeowners as a class as to the issue of liability for the accident. However, it ruled that damages of the individual homeowners would have to be proven in separate trials. The propriety of that order is not at issue herein.

**2.** Although Sun is also an appellee in Gouza's appeal, for ease, we refer to the plaintiff-homeowners as appellees.

where it crosses Green Street and continues underground where there are no longer any roads.

In 1982, Davis received the cable television franchise for Newtown Township. It hired Design to prepare the construction maps for the cable network and Tri-State to perform the underground cable installation. Representatives of Davis and Tri-State met with Gouza, the township engineer, on October 13, 1982, in order to receive highway occupancy permits that are required before excavation work may be performed on roads. Tri-State employees presented design maps for the cable television system at the meeting. The underground routes for cable installation were depicted on the maps, including an underground crossing of Richboro Road. Gouza issued forty road occupancy permits as a result of the meeting. The permits referred to the maps presented to Gouza at this meeting. Gouza never informed Tri-State or Davis that any of their proposed crossings were not covered by the permits, and there were sufficient permits issued by Gouza to cover all crossings indicated on the maps presented at the meeting. Richboro Road is a state highway, and Gouza does not have the authority to issue a permit for it. However, he did not inform the construction companies that he did not have this authority, and there was evidence presented that those companies did not realize that the road was state-operated until after the accident. The evidence also indicates that Gouza had reason to know of the location of Sun's pipeline. Reproduced record ("R.R.") at 1051a–55a, 2191a.

The construction companies sent a letter to the Newtown Township supervisors confirming their meeting with Gouza. The letter states that at the meeting, in compliance with Newtown Township ordinances, the cable television companies filed a set of construction plans showing the location and design of the cable network to Gouza. Gouza was present at the Newtown Board of Supervisors meeting held on November 1, 1982, and was aware of the letter.

Gouza's liability arises from the duties imposed on him by a local ordinance as township engineer. The ordinance

granting the cable television franchise for Newtown Township to Davis provides that Davis must obtain approval prior to commencing sub-surface street construction. The ordinance, in turn, requires the township engineer to review construction plans and approve them.

Gouza requests that we grant him either judgment notwithstanding the verdict or a new trial based upon the following allegations of trial error: 1) appellees failed to present expert testimony as to the standard of care applicable to a professional engineer; 2) the trial court erred in charging the jury that Gouza's conduct should be examined by applying a reasonable man standard instead of that of a professional engineer; 3) the trial court characterized incorrectly the effect of the ordinance on Gouza's liability; and 4) the trial court erred by failing to require that certain defendants reveal the terms of a settlement which they reached.

In reviewing an order denying a new trial, we will reverse the determination of the trial court only when it "clearly and palpably abused its discretion or committed an error of law which controlled the outcome of the case." *Gray v. H.C. Duke & Sons, Inc.*, 387 Pa.Super. 95, 101, 563 A.2d 1201, 1204 (1989), quoting *Sweitzer v. Dempster Systems*, 372 Pa.Super. 449, 453, 539 A.2d 880, 881 (1988).

Our standard of reviewing the denial of judgment notwithstanding the verdict also is well-established. "[T]he sole duty of the appellate court is to decide whether there was sufficient evidence to sustain the verdict, granting the verdict winner the benefit of every favorable inference reasonably to be drawn from the evidence and rejecting all unfavorable testimony and inferences." *Lower Paxon Township v. United States Fidelity and Guaranty Co.*, 383 Pa.Super. 558, 561, 557 A.2d 393, 394 (1989), quoting *Walasavage v. Marinelli*, 334 Pa.Super. 396, 483 A.2d 509, 514–15 (1984).

Gouza's first contention on appeal is that he is entitled to judgment notwithstanding the verdict in that

appellees failed to present expert testimony on the issue of his negligence. He argues that since he is a professional engineer, appellees were required to present expert testimony to establish that his conduct did not conform to the standard of care of a professional engineer. We recognize that Gouza is an engineer and that the negligence alleged by appellees relates to performance of his duties as the township engineer. However, expert testimony is not required when the matter under consideration is simple and the lack of ordinary care is obvious and within the range of comprehension of the average juror. *Smith v. Yohe,* 412 Pa. 94, 194 A.2d 167 (1963); *Storm v. Golden,* 371 Pa.Super. 368, 538 A.2d 61 (1988); *Burns v. City of Philadelphia,* 350 Pa.Super. 615, 504 A.2d 1321 (1986). We concur with the trial court's conclusion that expert testimony was not needed in order to establish that Gouza's conduct was negligent. His negligence was obvious. He knew or should have known of the existence of the pipeline; he carelessly issued enough road occupancy permits to cover all road crossings, including the state road which transverses by the pipeline; he made no reasonable investigation to ensure that the construction maps had correctly marked all underground lines even though this was one of the responsibilities delegated to him under the ordinance. Gouza's lack of care was within the comprehension of the ordinary lay person.

■ Similarly, Gouza argues that the trial court erred in instructing the jury that his actions should be analyzed under a reasonable man standard. Instead, Gouza suggests that the jury should have been instructed under a professional engineer's standard of care. His argument entitles him to no relief. Gouza, citing a number of cases applying Restatement section 299 A, argues that since he was charged with negligence in connection with services rendered as township engineer, the jury should have been charged that his actions were to be evaluated under the standard of care required of professionals. However, Gouza fails to consider that this standard of care is a *higher*

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

standard of care than that applicable to an ordinary person. *See* Restatement (Second) § 299 A, comment a (skill as used in this section is something more than the competence required of any person who performs an act and is a special form of competence not part of the ordinary equipment of the reasonable man, resulting from the acquired training and learning).

Therefore, the trial court may have been in error not to charge the jury that Gouza owed a higher duty to appellees due to his special training and expertise. However, this error inured to Gouza's benefit in that the jury was permitted to evaluate his actions under a lesser standard of care. The jury nonetheless determined that Gouza was negligent, even evaluating his actions under the reasonable man standard. If a reasonable man would not have performed in this manner, certainly a specially trained professional, with special knowledge as to the existence of underground lines, would not have issued the permits in such a manner. Gouza, in effect, seeks a new trial wherein he would be judged under a higher standard of care than the standard of care which the jury determined he violated. This is an argument that appellees should make, and the argument provides no relief to Gouza since the error did not affect the outcome of the case as it relates to the jury's determination that Gouza was liable to appellees.

▮▮▮ Next, Gouza contends that the trial court's characterization of the effect of the township ordinance was incorrect. Gouza has failed to preserve this issue for our review in that he failed to object to the charge to the trial court on this basis. The trial court charged the jury that if it determined that Gouza had violated the ordinance and the violation was a proximate cause of the accident, it must find Gouza negligent as a matter of law. The correct charge was that violation of the ordinance may be considered as evidence of negligence. At the close of the charge, Gouza did not object to the charge as it related to the characterization of the effect of a violation of an ordinance. Gouza stated: "Also, [I] have a problem with your charge on the

ordinance. Again ... I think the jury can infer that the statute was designed to set standards for this cable company contractor, not the township engineer." Notes of Testimony, 10/20/86 (Volume XXIII), at 74. Clearly, Gouza's argument was that the ordinance did not impose a duty on him, but that the ordinance imposed a duty only on the cable contractors. His objection to the trial court was significantly different from his objection to the charge on appeal.

Under Pa.R.C.P. 227.1, errors which could have been corrected during trial by timely objection cannot constitute a ground for post-trial relief. Instantly, if the proper objection had been brought to the attention of the trial court, it would have been able to correct its error. We have ruled that "unless a specific exception has been taken to an alleged error in the trial court's instructions, the alleged error will be deemed waived and will not be considered by the reviewing court." *Wilkerson v. Allied Van Lines, Inc.,* 360 Pa.Super. 523, 537, 521 A.2d 25, 32 (1987). If Gouza had stated precisely that his objection was to the characterization of the result of violation of the ordinance, the trial court easily could have corrected its instruction on the ordinance to comport with the Pennsylvania Standard Jury Instructions, which state that failure to comply with an ordinance may be considered evidence of negligence, but do not state that failure to comply with an ordinance is negligence per se. Accordingly, since Gouza did not present this objection to the trial court, it is not preserved. *See Dilliplaine v. Lehigh Valley Trust Co.,* 457 Pa. 255, 322 A.2d 114 (1974).

■ Gouza's final allegation is that the trial court erred in refusing to give him access to the settlement agreement reached by certain of the parties. It is axiomatic that the settlement agreement among the settling tortfeasors could not be admitted into evidence or used for any purpose during the trial of this matter. 42 Pa.C.S. § 6141(c); *Wilkerson v. Allied Van Lines, Inc.,* 360 Pa.Super. 523, 533–34, 521 A.2d 25, 30–1 (1987). We will grant a new trial only

where an erroneous ruling contributed to the verdict. Thus, assuming arguendo, the trial court erred in not permitting Gouza to see the agreement, the error did not affect the outcome of the case since the agreement could not be utilized during the trial for any purpose. Accordingly, Gouza is not entitled to a new trial on the basis of this allegation of trial error.

## Appeal of Sun

Sun's liability for the accident was submitted to the jury on four theories. First, Sun marked the location of its pipeline, as required by federal regulations, inadequately. Second, Sun negligently performed the inspections of its pipeline that it is required to perform under federal regulations. Third, Sun was negligent for failing to join PA One–Call. Fourth, Sun unnecessarily delayed in its clean-up efforts, increasing the amount of leakage from the ruptured pipe.

On appeal, Sun raises four contentions:[3] 1) it should be granted judgment notwithstanding the verdict since it could not be found liable as a matter of law for negligently marking the location of its pipeline; 2) the trial court erred in submitting the issue of negligent pipeline surveillance to the jury; 3) the trial court erred in submitting the issue of post-accident delay to the jury; and 4) the trial court erred in submitting to the jury the issue of whether Sun was negligent for failing to join PA One–Call. Sun also contends that the trial court erred in failing to submit special interrogatories to the jury to ascertain upon which theory of liability its verdict against Sun was based. Sun requests a new trial if we determine that any of its first four issues have merit, since the jury's verdict may be based on any of the four theories, including the incorrect one.

■ Initially, we note that Sun's arguments are sometimes couched in terms of an incorrect premise. Sun con-

3. These are the issues that are raised in Sun's statement of issues presented on appeal; accordingly, these are the only issues which we address in this disposition. *See* Pa.R.A.P. 2116(a).

tends that to establish its negligence, appellees had to establish both that it had a duty to act and that its actions fell below the standard of care in the industry. A plaintiff in a negligence action has to establish only the existence of a duty, breach of that duty, causation, and damages. There is no general requirement that the plaintiff establish that the defendant's conduct failed to conform to some undefined industry standard.

■ We will now examine each issue raised by Sun in the order that Sun presents it and will examine the factual basis for each theory in connection with our discussion of that issue. First, Sun alleges that the federal regulation governing location of pipeline markers, 49 C.F.R. § 195.410, is vague and ambiguous, that Sun complied with the regulation, and that it is entitled to judgment notwithstanding the verdict as to this theory of negligence. We disagree.

First, Sun contends that the regulation is void since it requires that markers be placed "over" the pipeline, which is impossible in this case since the pipeline is buried under a paved road. Sun ignores the most significant language in the regulation when advancing this argument. The regulation states, in relevant part (emphasis added):

### § 195.410 Line markers.

(a) Except as provided in paragraph (b) [4] of this section, each operator shall place and maintain line markers over each buried pipeline in accordance with the following:

(1) *Markers must be located at each public road crossing*, at each railroad crossing, and in sufficient number *along* the remainder of each buried line so that its location is accurately known.

(2) The marker must state at least the following: "Warning" followed by the words "Petroleum (or the name of the hazardous liquid transported) Pipeline" (in

---

4. Paragraph b of the regulation discusses exceptions, one of which applies to urban areas. Our review of the photographs of the area convinces us that the area in question is not urban and accordingly, we reject Sun's suggestion that paragraph b is implicated in this case.

lettering at least 1 inch high with an approximate stroke of one-quarter inch on a background of sharply contrasting color), the name of the operator and a telephone number (including area code) where the operator can be reached at all times.

Thus, Sun focuses on paragraph (a) of the regulation, arguing that it requires it to place markers over the pipeline, which it could not do. We disagree. Part (1) of paragraph (a) clearly provides that markers must be placed at road crossings and along the locations where the pipeline continues underground. The regulation, fairly read in its entirety, provides for offset markers, *i.e.*, markers placed along the road. One of Sun's employees admitted that Sun now utilizes offset markers to mark where pipelines transverse paved roads. Specifically, the employee defined an offset marker as one "placed on the same side of the road that the pipe line traverses when the pipe line is under the blacktop...." Reproduced record ("R.R.") at 964a. The employee then acknowledged that there were no markers on Richboro Road where it intersects with Mill Pond. This clearly is a violation of the regulation, which requires markers at each public road crossing.

Next, the employee was asked Sun's present policy regarding offset markers.

Q. If you put markers along the road to show that a line was buried under the road, an offset marker, what would be your policy for the distance of those offset markers?

"THE COURT": What would be your practice?

....

A. Our practice would be to place them three to five hundred feet apart....

*Id.* at 965a.

■ Thus, there is evidence in the record that Sun utilizes offset markers. The regulation is not void as ambiguous. It states that markers are required along buried lines so that the location of the line is accurately

known. Instantly there was evidence that there were absolutely no visible markers along the location where this pipeline is under pavement. Thus, Sun had no markers visible to show the pipeline's approximate location. This was a violation of the regulations, and the issue properly was submitted to the jury.

We also reject Sun's second argument that the regulation is vague and unenforceable because it fails to define what constitutes a "sufficient" number of markers to locate underground lines. A sufficient number is simply a question of reasonableness. It is enough to alert a reasonable person to the existence of the buried pipeline. Instantly, the evidence establishes that Sun had no visible markers at the public road crossing, which clearly was required by the regulation. Further, it had no visible markers along the location where the pipeline was buried, even though the pipeline extends 2,000 feet underground along the road. Appellees presented expert testimony as to what would constitute a sufficient number of offset markers [5] to inform the public accurately as to the location of the underground pipeline. Sun did not have this number. Accordingly, the evidence was sufficient to establish that Sun violated the unambiguous regulation, and we reject Sun's argument on this issue.

Next, we address Sun's contention that there was no evidence to support submission to the jury of the issue of whether it negligently conducted surveillance of its pipeline. Once again, federal regulations require surveillance of any underground pipeline carrying hazardous substances. 49 C.F.R. § 195.412. At trial, Sun admitted that it conducted an aerial surveillance of the pipeline on November 8, 1982. We believe that there was sufficient evidence presented at trial for the jury to find that construction along the pipeline actually occurred on that date and that the pilot who

---

5. Sun presented expert testimony to the effect that the regulation requires markers over the pipeline, which is impossible in this instance. Under our standard of review for a judgment notwithstanding the verdict, we are required to reject this evidence which contradicts the evidence of the verdict winner.

conducted the aerial surveillance should have seen the construction. The following was established at trial. On November 8, 1982, the cable company had three crews working within the Newtown Crossing area. There were two to three men per crew, and each crew was performing a separate task. The equipment they were utilizing included a one ton utility truck and two to three trailers carrying orange vibrator plows. There also was a backhoe on a white truck which was pulling an orange compressor. In addition, the crew had placed eighteen inch cones with signs and orange flags which stated that men were working in the area. These cones were "all out on Newtown Crossing on November 8, 1982." R.R. at 558a.

We conclude that this evidence was sufficient for the trial court to charge the jury on the concept of negligent inspection. There was sufficient evidence for the jury to conclude that Sun's agent inspected the pipeline negligently in that a reasonable person under the circumstances would have seen the construction activity in the vicinity of the pipeline, recognized that it was close enough to the pipeline to pose a threat, and reported it to Sun. Compare *Farnese v. Southeastern Pennsylvania Transportation Authority*, 338 Pa. Super. 130, 487 A.2d 887 (1985) (evidence insufficient to submit issue to jury). We also note that Sun's evidence established that the purpose of the overflight inspections is to ensure that there is no construction activity near the pipeline. R.R. at 1992a, 1999a. Thus, the pilot was on the lookout for the very thing he failed to observe.

As to the issue of post-accident delay, the evidence established that the telephone number posted for emergency use on Sun's pipeline was incorrect and, furthermore, that it took Sun at least five and one-half hours to start clean up work once it was contacted about the gas spill. At approximately 5:30 p.m. Sun had two trucks at the scene that pumped two loads of gasoline. Further efforts to contain the spill commenced nine hours after the spill. Sun concedes that the delay caused spilled gasoline to dissipate into the ground, making it incapable of being recovered.

We conclude that there was sufficient evidence for the trial court to submit the issue of post-accident delay to the jury. The jury could have concluded that five and one half hours was too long a period to commence clean up, that two trucks were inadequate and the time, and that nine hours to commence more serious efforts was unreasonable as well. Accordingly, we conclude that there was sufficient evidence for the trial court to submit the issue of post-accident delay to the jury. *See Gray v. H.C. Duke & Sons, Inc.*, 387 Pa.Super. 95, 563 A.2d 1201 (1989).

■■■ Next, Sun alleges that appellees had to produce expert testimony in order to establish its liability for post-accident delay. The rules regarding expert testimony are not complex. There are many situations where expert testimony is admissible, but whether such testimony is required in order to establish liability is another matter.

> "[I]f all the primary facts can be accurately described to a jury and if the jury is as capable of comprehending and understanding such facts and drawing correct conclusions from them as are witnesses possessed of special training, experience or observation, then there is no need for the testimony of an expert." *Reardon v. Meehan*, 424 Pa. 460, 465, 227 A.2d 667, 670 (1967). Expert testimony becomes necessary when the subject matter of the inquiry is one involving special skills and training not common to the ordinary lay person.

*Storm v. Golden*, 371 Pa.Super. 368, 538 A.2d 61, 64 (1988).

Thus, the situations in which expert testimony is required to establish a prima facie case of negligence are limited.

> There are some situations in which expert testimony is indispensable to the establishment of a *prima facie* case. For example, generally, in a personal injury case medical testimony is necessary to causally connect the plaintiff's injuries with the accident, and to establish the necessity of medical treatment and the reasonableness of the charge therefor. But where there is a sufficiently close relationship between the accident and the injury, the

causal relationship may be established without the aid of expert testimony....

Similarly, in medical malpractice cases expert testimony is ordinarily essential to establish that the treatment rendered was not in accord with acceptable standards of medical practice and that the injury complained of was proximately caused by the improper treatment.

The only exception to the necessity of producing expert testimony in support of a claim of medical malpractice exists where the matter under investigation is so simple, and the lack of skill so obvious as to be within the range of ordinary experience and comprehension of even non-professional persons.... Likewise, in a suit against an architect for negligent design, in a suit against a dentist for malpractice and in a suit against a lawyer for mal-practice, expert testimony is necessary to establish pro-fessional negligence. And expert testimony is required to show the inadequacy of warnings in a product liability case against a drug manufacturer.

Feldman, *Pennsylvania Trial Guide*, § 6.81 at 338–40 (2d rev. ed.) (footnotes omitted).

 In summary, expert testimony is required to establish professional negligence where the determination of whether the actions were negligent is beyond the understanding of the ordinary person. In this instance, Sun was not operating as a professional. Furthermore, there is nothing either technical or beyond the comprehension of the average juror at issue. Sun did not have any personnel on the scene of the accident for hours. The jury could have determined with the evidence before it, including Sun's evidence as to where its nearest facilities were located and when it was informed about the puncture, whether Sun's delay was unreasonable and contributed to the leakage of gas. No expert testimony was required.

 Next, Sun alleges that it was improper to submit its failure to join PA One–Call to the jury since it had no statutory duty to join PA One–Call. PA One–Call is a service organization which attempted to have all companies

with underground cables join its service. Its purpose is to inform all contractors who will be excavating over public roads as to the whereabouts of all underground pipelines and cables. The service also informs all members about construction proposed in the vicinity of the buried pipes and cables. There was evidence that PA One–Call recruited Sun, and there was evidence that the cable contractors called PA One–Call prior to excavation work.

Initially, we disagree with Sun's premise that it had no duty to join PA One–Call since it was not required to join PA One–Call by statute. A duty to perform an act (as opposed to a duty to act in a non-negligent manner once an act is undertaken) may be imposed in the absence of statute. For example, Restatement (2d) of Torts section 321 provides that where the prior act of the actor has created a risk of harm, the actor is under a duty to exercise reasonable care to prevent the risk from taking effect. *See also* Restatement (2d) of Torts § 323. In this case, the presence of the unmarked pipeline located under a paved roadway created a risk of rupture. The obviousness of the risk is underscored by the numerous regulations designed to prevent puncture.

We believe that, under traditional duty analysis, Sun should have taken reasonable precautions to prevent the risk of rupture. Joining PA One–Call certainly seems to require de minimis effort and to be significant in preventing risk of rupture. Furthermore, since Sun would have been informed of the proposed construction as a member of PA One–Call, there was evidence that if Sun had joined PA One–Call, the rupture would not have occurred. Thus, it was proper for the trial court to submit this issue to the jury.

*Glick v. Martin and Mohler, Inc.*, 369 Pa.Super. 428, 535 A.2d 626 (1987), is distinguishable factually from this case. There, defendants were sued for failing to secure the vacant building where the plaintiff had been raped. We determined that the presence of the building was a fortuitous circumstance and that the rape would have occurred

whether or not the building had been secured—in a different location. Thus, it is clear that in *Glick* the actions of the defendant did not create the risk of harm suffered by the plaintiff.

In the present case, the risk of rupture of a pipeline under a paved road is obvious and the simple action of joining PA One–Call would have significantly reduced the risk created by the presence of the pipeline under the road. Sun was required under federal regulations to take a number of steps to prevent against unintentional rupture of its line—an extremely foreseeable event. The trial court charged the jury under general negligence principles that Sun was under an obligation to take reasonable steps to prevent a rupture, and we concur. Joining PA One–Call certainly could be considered by the jury as a reasonable step designed to prevent a rupture of the line. Accordingly, we chose to apply section 321 of the Restatement of Torts under the facts presented in this case.

Judgment affirmed.

CIRILLO, President Judge, files a concurring statement.

CIRILLO, President Judge, concurring:

Sun alleges that the trial court erred when it submitted to the jury the issue of whether it was negligent for failing to become a member of PA One–Call. While I agree with the majority's disposition of this issue, I can only concur in the result because of the majority's reliance on section 321 of the Restatement (Second) of Torts.

In *Glick v. Martin and Mohler, Inc.*, 369 Pa.Super. 428, 535 A.2d 626 (1987), this court stated:

> The Supreme Court of Pennsylvania has never adopted section 321 as the law of Pennsylvania, and as the intermediate appellate court, we decline to do so. Section 321 fails to include any concept of to whom the duty is owed, which is a necessary element of a cause of action sounding in tort. . . . Secondly, the description of the prohibit-

ed conduct (that which poses "unreasonable risk") is too vague to permit principled application of the conduct. *Id.*, 369 Pa. Superior Ct. at 435, 535 A.2d at 629 (citation omitted) (footnote omitted). While the majority distinguishes the facts of the present case from *Glick*, the concerns voiced by this court in *Glick* were not limited to its facts. The problems inherent in creating a cause of action based on section 321 are intrinsic to that section and are not vitiated simply by a change in facts. Tort law should shape society's actions by "distinguish[ing] between acceptable and prohibited behavior and ... [by] penaliz[ing] the latter." *Glick*, 369 Pa.Super. 438, 535 A.2d at 631. While Sun's actions in the present case may appear to fit squarely within the parameters of a section 321 cause of action, the majority's recognition of such a theory of tort liability does not provide guidelines to influence future behavior.